UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR No. 3:12-40-JFA |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| CARL QUENTIN WOODS | ) | |
| _____ | ) | |

This matter is before the court on defendant's *pro se* motion for a reduction in his sentence pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A) (ECF No. 562).[1] The defendant contends that his 384-month sentence is excessive as a result of his two "stacked" § 924(c) gun convictions and this presents an extraordinary and compelling reason for the court to reduce his sentence.

The government has responded in opposition, and the defendant filed a supplement to his original motion. The court has carefully considered the record before it and conducted an individualized analysis of the facts and issues raised by the parties. For the reasons which follow, the defendant's motion is granted in part and denied in part.

STANDARD OF REVIEW

"A sentencing court may not, as a general matter, 'modify a term of imprisonment once it has been imposed.' " *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022) (quoting 18 U.S.C. § 3582(c)). Compassionate release is an exception to this rule that

_____

[1] The defendant's first motion (ECF No. 557) was superceded by his second motion (ECF No. 562), thus his first motion is deemed to be moot.

permits the sentencing court to reduce a defendant's sentence "if it finds that ... extraordinary and compelling reasons warrant such a reduction" and the reduction aligns with "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable" as well as "applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *See United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *See Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. It was originally adopted as part of the Sentencing Reform Act of 1984.

On December 21, 2018, the First Step Act was signed into law. Broadly, the Act's goals were to reform federal prisons and sentencing laws to reduce recidivism, decrease the federal inmate population, and maintain public safety. The First Step Act also expanded the existing compassionate release provisions of federal law by allowing an inmate to move for compassionate release himself, rather than allowing only the Director of the Bureau of Prisons (BOP) to do so. The relevant portion of the First Step Act, codified at 18 U.S.C.

2

§ 3582(c)(1)(A), as amended by § 603(b) of the First Step Act, provides:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) [of Title 18] to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

By its terms, § 3582(c)(1)(A) permits the court to reduce the defendant's term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if the court first finds that (i) extraordinary and compelling reasons warrant such a reduction; and (ii) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. In addition, a district court may not grant a sentence reduction under § 3582(c)(1)(A) without considering the § 3553 factors to the extent they are applicable. *United States v. Kibble*, 992 F.3d 326, 332 (4th Cir. 2021).

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), the Fourth Circuit agreed with the Second Circuit in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) and found that there is, as of now, no "applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A)," and as a result, district courts are "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise." *McCoy*, 981 F.3d at 284 (citing *Brooker*, 976 F.3d at

3

230); *see also, Kibble*, 992 F.3d at 331.

A defendant's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t). Also, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court generally proceeds in three steps. *See United States v. High*, 997 F.3d 181, 185–86 (4th Cir. 2021). First, the court determines whether "extraordinary and compelling reasons" support a sentence reduction. Next, the court considers whether a sentence reduction is consistent with applicable policy statements issued by the Sentencing Commission. As noted previously in this order and as set out in *McCoy*, because there is no applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A), district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise. Finally, if the court finds that extraordinary and compelling reasons warrant relief, the court must consider the § 3553(a) factors in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment.

Even if the defendant meets the eligibility criteria for compassionate release, this court retains discretion as to whether to grant relief. *See* 18 U.S.C. § 3582(c)(1)(A) (providing the court *may* reduce the term of imprisonment) (emphasis added).

*Exhaustion of Remedies*

Before a court may consider a defendant's motion for compassionate release, the defendant must have completed the initial step of requesting that the BOP bring a motion on their behalf. The defendant may file a motion with the court after (1) fully exhausting all administrative rights to appeal; or (2) after the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). *See United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021).

The government concedes that the defendant has exhausted his remedies with the BOP. Thus, this court will proceed to review the matters on the merits.

PROCEDURAL HISTORY — THE OFFENSE CONDUCT[2]

1. *First Armed Robbery (May 25, 2011)*

On May 25, 2011, officers with the Columbia Police Department responded to a call regarding an armed robbery at the same Wild Wing Cafe located on Bower Parkway in Columbia, South Carolina. Upon arrival at the scene, officers made contact with the restaurant employees and witnesses who provided detailed accounts of the robbery. Thurmond Walker, an employee of a nearby business, stated he was smoking a cigarette at the rear of the business when he observed three men, later identified as Carl Woods, Jamario Ford, and Alfred Turnipseed, wearing ski masks exited from a 2006 Ford Focus. As he was

---

[2] It should be noted that Woods' two co-defendants, Ford and Turnipseed, were charged with a third robbery at the Wild Wing Cafe that occurred on January 18, 2021. Woods was not involved in this robbery.

approached by Woods, Ford, and Turnipseed, Walker advised one of the men grabbed him by the neck, held a gun to his back, and yelled, "Get up, get up, come with me!," while dragging him towards the back of the business. Walker advised Woods, Ford, and Turnipseed also grabbed Charles Mullins, who was standing in front of the door, and threw him to the ground. Walker stated while he and Mullins were being held at gunpoint on the ground, one of the robbers demanded their cell phones, and both men complied with the demand.

After obtaining Walker's and Mullins' cell phones, Walker indicated Woods, Ford, and Turnipseed knocked on the back door of the Wild Wing Cafe and yelled, "Truck!" so an employee would think a delivery truck had arrived. Employee Carrie Lyerly opened the door and was immediately overtaken at gunpoint by Woods, Ford, and Turnipseed. Lyerly later told officers she panicked and fell to the ground. Once the robbers entered the business with Walker, Mullins, and Lyerly being held at gunpoint, Walker told officers Woods, Ford, and Turnipseed put them in the bathroom located in the rear of the business. Once inside the bathroom, Walker relayed Mullins was able to lock the door.  A few seconds later, one of the robbers attempted to open the door, and, upon discovering the door was locked, began yelling for them to open the door or "I'm gonna shoot this motherfucker up." Fearful for his life, Walker stated he opened the door. According to Walker, one of the robbers pushed the door open, pointed his gun at them, demanded they be quiet, and shut the door back. Approximately five minutes later, Walker indicated Mullins left the bathroom, saw the robbers had left, and called the police.

6

Brian Neal, a manager at the Wild Wing Cafe, stated he walked into the manager's office at approximately 9:00 a.m. on the morning of the robbery to do paperwork. Approximately five minutes later, Neal heard a knock at the backdoor and witnessed Lyerly walk to the door to open it. Neal stated he heard "hollering" at the back door but did not think much of it due to the fact it seemed normal in the regular work atmosphere. A few seconds later, Neal related his office door was forced open, and Neal saw a black male pointing a nickel-plated revolver towards his head. The man told Neal to open the safe. Neal stated he entered the safe's combination incorrectly during the first two attempts. Neal indicated he became nervous as he knew if he entered the combination incorrectly for a third time, the safe would lock him out. Neal explained this issue to the robber and told him he needed to calm down so he could successfully open the safe. The robber lowered his gun from Neal's head and stepped back. Neal successfully opened the safe and gave the robber $5,600.00 in U.S. currency. Neal told the robber, "If you hold the bag open, I'll load all the money into it because I don't want to lose my life over this." After Neal put all the money into the canvas bag, the robber exited the office and another black male came in and knocked down all the computers, telephones, and everything on the countertops.

Paul Chimel, the restaurant manager, told responding officers he was in the kitchen when Turnipseed, came in with a gun and told him to get on the ground. Chimel advised Turnipseed attempted to disguise his voice because he (Turnipseed) was formerly employed at the Wild Wing Cafe and had a speech impediment which would give away his identity.

7

After Ford, Turnipseed, and Woods fled the business, Chimel indicated he locked the back door, exited through the front door of the business, and walked to his vehicle to call law enforcement.

As part of their active investigation into the Wild Wing Cafe robberies, the police "pinged" the cell phones which were stolen from the May 25, 2011 robbery. The phones were found later that day and the police found a fingerprint on one of the phones and were able to determine that it belonged to Woods. The police began looking for Woods but were unable to find an address for him; however, on June 14, 2011, Woods, Ford and Turnipseed, were arrested for an armed robbery of a Bi-Lo grocery store in Columbia.

*2. Second Armed Robbery (June 14, 2021)*

On June 14, 2011, officers with the Columbia Police Department (CPD) responded to a call regarding an armed robbery at a Bi-Lo grocery store located in Columbia, SC. After interviewing victims and witnesses on the scene, investigators learned three armed men, later identified as Woods, Ford, and Turnipseed entered the store and demanded cell phones from customers and employees before taking approximately $2,095.00 from the money office. Surveillance video captured Ford carrying out the white garbage bag filled with money and stolen goods. During the course of the robbery, a witness stated she heard a gunshot fired while she was in the store. Another witness provided officers with a description of the getaway vehicle as a white Mitsubishi missing a right front hubcap. Based on that description, CPD officers dispatched all officers in the area to be on the lookout for the car.

CPD Master Police Officer (MPO) Robert Uhall was in the immediate area of the robbery when he heard the dispatch officer advised of a pending call referencing a man with a gun at 4000 Plowden Road in Columbia, SC. MPO Uhall answered the call and responded to the Columbia Gardens Apartment Complex located on Plowden Road. As he was patrolling the area near building 29, MPO Uhall found the neighborhood to be quiet and cleared the dispatch call as unfounded. Before leaving the apartment complex, MPO Uhall observed a white Mitsubishi Mirage in front of building 19 which matched the description of the vehicle used to drive away from the Bi-Lo armed robbery. MPO Uhall inspected the vehicle and observed black clothing on the front passenger floor board covering up what appeared to be a silver handgun with gray duct tape wrapped around the handle. MPO Uhall called dispatch for assistance, and additional officers arrived to set a perimeter around the area.

While securing the area, MPO Uhall was approached by a woman who told him she saw three black males exit the Mitsubishi Mirage and enter an unknown apartment in building 19. CDP officers made contact with the residents in building 19 and eliminated several of the apartments as suspected hiding places for the robbers. MPO Uhall knocked on the door at apartment E in building 19 and waited several minutes before a pregnant woman, later identified as Tila Terry, opened the door. When asked if she was the only person in the apartment, Terry told him there was no one in the apartment other than herself. While looking over Terry's shoulder, MPO Uhall was able to see a black male with shoulder length

dreadlocks, later identified as Woods, standing in the hall.

Fearing Terry may have been being held against her will, MPO Uhall pushed open the door and ordered Woods to the ground. As MPO Uhall was handcuffing Woods, Ford and Turnipseed came into the room and were arrested.

CPD officers obtained and executed a search warrant on Apartment 19E. During the search, officers located the following items: (1) a Harrington and Richardson 12 gauge shotgun bearing serial number BA541415 and a Stevens and Tool 12 gauge-shotgun bearing serial number 63681 inside a kitchen closet; (2) a white trash bag containing $2,067.00 in U.S. currency, 19 packs of Swisher Sweets cigarillos, 8 packs of Swisher Sweets blunts inside the kitchen closet; (3) two pair of black Nike tennis shoes, a pair of black pants, and a black ski mask inside a bedroom closet; (4) two packs of Newport cigarettes and a roll of gray duct tape in the top left drawer of a bedroom dresser; (5) a 9mm Hi-Point semiautomatic firearm, bearing serial number P072969 with one round of 9mm Luger ammunition in the chamber and two rounds of 9mm Winchester ammunition in the magazine on a bedroom floor; and (6) a black ski mask in a box on the top shelf of a shelving unit in the living room. During a search of the Mitsubishi Mirage, CPD officers discovered the following items: (1) a .357 caliber Smith & Wesson revolver, Model 65-2, bearing serial number 1D52831 located on the front passenger floor board; (2) a black thermal shirt, a black ski mask, black sock stockings, a black baseball cap, and a pair of blue latex gloves located on the front passenger floor board.

10

Following his arrest, Turnipseed was advised of his Miranda warnings and provided the following written statement to investigators:

> At 5 a.m., Q (Woods) came to my house and mom said he at the door. I got up went to the door, and he say Jamario want me. I put some close on and went. When I got there Jamario say U ready to pay dat money. I don't have it. He say I want and need my money. So go home and get some close and come on we going to get it. They have guns so I'm scared and I go. We go and I say I can't do it. They left and met bugg. He got in. He say I got no close. Jamario say give him your shirt and shoes. I did and went that way to Bi-Lo. Q was driving Jamario in the passenger. Me and the other guy in the back. They pull up, went it. I got behind the driver seat then they came out go in and pull away. Went to Tila house. Got out wit bag and went in. They made me go. I didn't want to. Jamario had a silver gun and Q had a black 1. I don't know what bugg have and Tila had nothing to deal with it. Jamario tried to make me go cause I owe him money for my bond. Please don't tell them I told.

Turnipseed identified "Q" as Carl Woods and "Jamario" as Jamario Ford. Turnipseed further stated the group used a "4 door white little car" to commit the robbery. Turnipseed claimed Ford initially told him on June 11, 2011, he wanted his (Turnipseed's) help to rob the Bi-Lo. According to Turnipseed, Ford advised he, Wood, and Turnipseed would participate in the armed robbery. After Woods parked the car in front of the grocery store, Ford told the group "what they gone do and where to go." Turnipseed indicated they put on masks before getting out of the car. Turnipseed asserted Ford instructed "Don't open that door and go in the back room" when the police arrived at Terry's apartment after the robbery.

In summary, Woods was involved with a conspiracy with Turnipseed and Ford to commit at least two armed robberies throughout the Columbia area of South Carolina.

*The Indictment and Court Proceedings*

Defendant Woods and four co-defendants (Jamario Ford, Alfred Turnipseed, Jr., Darrell Antonio Wright, and Albert Wallace, Jr.) were charged in a 10-count Indictment with:

Count 1:    conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951.

Count 2:    Hobbs Act robbery on January 18, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 3:    using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on January 8, 2011, in violation of 18 U.S.C. § 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2;

Count 4:    Hobbs Act robbery on May 25, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 5:    using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on May 25, 2011, in violation of 18 U.S.C. §§ 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2;

Count 6:    Hobbs Act robbery on June 9, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 7:    using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on June 9, 2011, in violation of 18 U.S.C. §§ 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2;

Count 8:    Hobbs Act robbery on June 14, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 9:    using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, and cause one of said firearms to be discharged on June 14, 2011, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), (c)(1)(A)(iii) and 18 U.S.C. § 2; and

Count 10:[3]   felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), 924(a)(2) and 924(e).

The defendant pleaded guilty, pursuant to a written plea agreement (ECF No. 252), to Counts 5 and 9, both of which charged violations of § 924(c). The remaining Counts 1, 2, 3, 4, 6, 7, and 8 were dismissed on motion of the government at sentencing.

The Presentence Report ("PSR") (ECF No. 314) prepared by the United States Probation Office calculated the otherwise applicable guideline range for this case, but then advised that the defendant's sentence should be driven by the statutory penalties for the counts of conviction, rather than the sentencing guidelines. Specifically, the mandatory minimum sentence on Count 5 was 7 years (84 months), and the mandatory minimum sentence on Count 9 was 25 years (384 months), with a maximum of Life, with the provision that the sentence on Count 9 must run consecutive to any other term of incarceration. The 2012 version of the Guidelines Manual was used in the calculations.

Based upon these statutory provisions, on August 22, 2013 this court sentenced the defendant to 384 months consisting of 84 months on Count 5 and 300 months on Count 9, both sentences to run consecutively.

---

[3]   Woods was only charged in Counts 1, 4, 5, 6, 7, 8, and 9, as well as the forfeiture allegations.

Thereafter, the defendant filed a notice of appeal and the Fourth Circuit Court of Appeals affirmed the defendant's conviction in its mandate issued September 16, 2014 (ECF No. 359). The defendant also filed an unsuccessful petition pursuant to 28 U.S.C. § 2255.

On December 31, 2014, pursuant to Fed. R. Crim. P. Rule 35, this court entered an amended judgment reducing the defendant's sentence on Count 5 to 42 months and on Count 9 to 300 months (for a total of 342 months), to run consecutively.

## DISCUSSION

1. *Request for Compassionate Release due to Medical Conditions*

The defendant contends that his various medical conditions, coupled with the ongoing COVID-19 pandemic, constitute extraordinary and compelling reasons for consideration of his immediate release. He states in his motion that he has been diagnosed as suffering from asthma and bronchitis since childhood. Although the defendant has recovered, he states that he contracted COVID-19 and has lingering symptoms. He states he fears that he may die if another outbreak occurs within the prison.

The government has provided the court with the defendant's sealed medical records from 2021 to 2023. A review of the medical records does not mention asthma or bronchitis. The medical records do note that the defendant has had numerous dental issues, skin issues (ringworm), a superficial finger injury, that he is not on any over the counter or prescription medications, and that he has tested positive for the sickle cell trait, but has never had a sickle cell crisis. In a November 9, 2021 BOP health screen encounter form, the defendant denied

14

any seizures, diabetes, cardiovascular issues, hypertension, respiratory issues, carcinomas or Tuberculosis.

A review of the Presentence Report (PSR) (ECF No. 314) prepared in June 2013, shows that the defendant indicated he was in generally good health, though he reported suffering from severe acid reflux and seasonal sinus problems. The defendant reported in the PSR that he was diagnosed with pneumonia as a child, but he advised that he has suffered no problems since that time. (ECF No. 314 at ¶ 72).

After a careful review of the medical records, this court finds that the medical records are lacking a history of the ailments complained of by the defendant. Thus, the defendant has failed to show an extraordinary or compelling reason for compassionate release on this basis.

### 2.   *Request for Relief due to § 924(c) Stacking*

In § 403 of the First Step Act of 2018, Congress amended 18 U.S.C. § 924(c) so that it does not apply unless a defendant had a previous, final conviction for a § 924(c) charge at the time of the offense.[4]   This effectively did away with the so-called "stacking" procedure that had been followed by the district courts across the country for many years. The First Step Act expressly provided that this change in the law was *not* retroactive.

---

[4] Based on this amendment, § 924(c)(1)(C) now provides: "In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall – (i) be sentenced to a term of imprisonment of not less than 25 years. . . ." The other provisions of § 924(c), including those requiring a 7 year mandatory minimum term for brandishing a firearm in relation to a crime of violence, and directing that each sentence under § 924(c) must run consecutively to any other sentence imposed, remain unchanged.

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2021), however, the Fourth Circuit Court of Appeals indicated that the former practice of stacking § 924(c) convictions could be considered in a fresh look at sentencing under motions brought pursuant to § 3582(a)(1)(C) of the First Step Act.

*McCoy* was perhaps the most significant sentencing decision handed down by the Fourth Circuit in recent years. In that decision, the Court discussed at length the changes related to sentences under § 924(c) prior to and subsequent to the First Step Act. Specifically, prior to enactment of this landmark legislation, a conviction under § 924(c) was treated as "second or subsequent" (thereby triggering the 25-year mandatory minimum sentence) even if the first § 924(c) conviction was obtained in the same criminal case. The First Step Act ended this practice known as "stacking" by clarifying that the 25-year mandatory minimum applies only when a prior § 924(c) conviction arises from a separate criminal case and has already become final. As summarized by the Fourth Circuit, "Under Section 403 of the First Step Act . . . the 25-year mandatory minimum is 'reserved for recidivist offender, and no longer applies to multiple § 924(c) convictions obtained in a single prosecution." *McCoy*, at 275 (quoting *United States v. Jordan*, 952 F.3d 160, 671 (4th Cir. 2020)).

Notwithstanding the statutory language making the anti-stacking provision non-retroactive, the Court held that a defendant seeking reconsideration of his sentence could assert that the First Step Act's revised sentencing law in § 924(c) convictions may meet the

16

"extraordinary and compelling" standard in compassionate release motions.

Finally, and most importantly, the *McCoy* Court stressed the "severity of [the] § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence that a defendant would receive today." *Id*. at 285.

As noted earlier in this order, § 403 of the First Step Act amended § 924(c) to provide that the 25-year consecutive term for a successive § 924(c) offense does not apply unless the defendant had a previous, final conviction for a § 924(c) charge at the time of the offense.

If sentenced today, the defendant would face the same 7-year sentence on Count 5, but only a 10-year sentence on Count 9. The statute still requires each such sentence to run consecutively to each other and to any other sentence imposed. That means the mandatory minimum sentence on two § 924(c) counts, if charged today as in the same initial § 924(c) prosecution, would be 17 years (204 months) instead of 32 years.

The defendant has been in federal custody since June 14, 2011 and he is scheduled to be released on December 31, 2035. He has served approximately 12 years and 1 month of this original 384-month sentence, or 37 % of his sentence.

To say that the central holding in *McCoy* overlaps with defendant's claims here is not dispositive of the issue. The Fourth Circuit in *McCoy* went to great lengths to emphasize particular circumstances presented in that case and, on more than one occasion, noted that the sentence reductions approved in that case were the product of "individualized assessments" of each individual defendant's sentence. *Id*. at 286.

17

Quoting from *United States v. Bryant*, 2020 WL 2085471, at *5 (D. Md. Apr. 30, 2020) the Court stated that "it is not unreasonable for Congress to conclude that not all defendants convicted under § 924(c) should receive new sentences, even while expanding the power of the courts to leave some defendants of those sentences on a case by case basis." (emphasis in original).  The Court further explained, "there is a significant difference between automatic vacatur and resentencing of an entire class of sentences— with its 'avalanche of applications and inevitable re-sentencings,'—and allowing for the provision of individual relief in the most grievous cases." *Id.* at 286–87 (quoting *United States v. Haynes*, 456 F. Supp. 3d 496, 516 (E.D.N.Y. 2020)).

With this principal established, the court turns to the specific facts in the defendant's case to provide the individualized assessment called for in *McCoy*. The defendants in *McCoy* were somewhat similar to the defendant here.  *McCoy* was only 19 years old at the time of the commission of his crime and his only prior conviction was for reckless driving. In the three other cases, the defendants were between 22 and 24 years old at the time of their offenses.  One of those defendants had no criminal history and another had one minor prior conviction for which he served no jail time.

Here, the defendant was nearly 22 years old at the time of the commission of his crimes, but he had several convictions on his record as noted above.

All of the defendants in *McCoy* had received sentences of 45 years. Each defendant had served approximately 25 years in prison. Here, the defendant's sentence was 32 years

18

and he has served approximately 12 years of his sentence. The then-applicable stacking regime in *McCoy* increased those defendants' sentences by 30 years. The increase prescribed for the defendant in this case was 15 years.

In discussing the actual crimes committed in the "Bryant wing" of the *McCoy* decision, the Court noted that although the defendants were convicted of armed bank robbery, none of those robberies resulted in any injuries. There is no indication whether *McCoy's* victims were injured in the § 924(c) counts for which he was convicted. In this case, no one was actually injured, but a firearm was brandished and the patrons of the two establishments were obviously terrorized for a significant amount of time.  In the Bi-Lo robbery, patrons were required to give up their cell phones and in the Wild Wing Cafe robbery, a gun was placed against the temple of the manager as he opened the safe.

The *McCoy* Court emphasized the defendants' post-sentencing conduct and rehabilitation.

### Factors under 18 U.S.C. § 3553(a)

The court now turns to a review of the § 3553(a) factors:

1. *Nature and Circumstances of the Offense*.  The defendant participated in a most serious criminal violation as set out in detail earlier in this order.  The defendant benefitted significantly from the prosecutor's agreement to dismiss the remaining eight counts against him.  The government ( through the same Assistant United States Attorney who prosecuted this case originally) now argues that had the government known that the defendant would not

be facing a "stacked" § 924(c) sentence for the two counts of conviction, the government would never have agreed to drop so many other counts.[5]  However, other district courts have rejected such arguments, suggesting that they require the court to engage in speculation and this court adopts the rational employed in those decisions.  *See United States v. Smith*, 39 F.Supp. 543 (W.D.Va 2019); *United States v. Steppe*, 3:16-cr-22 (W.D.Va., Apr. 20, 2021).

2.  *History and Characteristics of Defendant*.  The defendant is currently 34 years old.  He is single, never having been married, and has one child.  Before incarceration, he lived in South Carolina all of his life and last resided with his mother and son in Columbia, South Carolina.  The defendant completed the 10th grade.

The defendant has several convictions for possession of marijuana.  He also has convictions for petty larceny and unlawful carrying of a pistol.  Had the Guidelines been applied to his case, his criminal history category would have been III.  The defendant has at least three disciplinary violations while in prison including one involving the use of drugs or alcohol which imposes a significant security risk in prison.  He has lost Good Time Credit for his disciplinary violations while at the BOP.

### Post-Sentencing Conduct

The court would note that the defendant has availed himself to numerous education and vocational courses while incarcerated.  He states that he has obtained his GED and has

---

[5]  This may well be the reason that Congress expressly stated that the anti-stacking provision of the First Step Act was not retroactive.  A retroactive application upsets settled bargains from years ago that were made in good faith.

completed more than 40 classes offered by the BOP.

The government notes that the defendant has had three disciplinary infractions in the 10 years he has served, including the use of drugs/alcohol which poses a significant security risk in prison.

3.  *Seriousness of the Crimes*.  As evidenced by the historical facts set out in the PSR involving the defendant's instant convictions, this court regards the defendant's crimes as very serious, fully supportive of a significant sentence.

4.  *Whether the Sentence Promotes Respect for the Law and Just punishment for the offense*.  The court finds a significant sentence is necessary to promote respect for the law and just punishment.

5.  *Whether the Sentence Affords Adequate Deterrence to Criminal Conduct*.  The court finds that a significant sentence is necessary to provide both general and specific deterrents.

6.  *Whether the Sentence Protects the Public from Future Crimes of the Defendant*.  The court finds that a significant sentence is necessary to protect the public from future crimes of the defendant.

7.  *Need to Avoid Unwarranted Sentencing Disparities*.

Given that mandatory minimums drove the defendant's sentencing, the defendant's sentence was fully in line with similarly situated defendants at the time it was issued.

This court has addressed the different reductions for defendants Ford, Turnipseed and Wood elsewhere in this order.[6]

CONCLUSION

Although the defendant's offenses were extremely serious and involved at least two separate armed robberies, the court concludes that the defendant has demonstrated an extraordinary and compelling reason for relief under § 3582(c)(1)(A) regarding his stacked § 924(c) charges.[7] That is, if the defendant were sentenced today, his sentence would be substantially lower as a result of the changes to the statute made by the First Step Act. The court reaches this conclusion after carefully considering the individualized circumstances of the case, and after considering the § 3553(a) factors.

In sum, the facts of the two robberies, coupled with the defendant's prior record, militate against a reduction down to the new statutory minimum in this case. Therefore, the court will impose a substantial reduction, but not all the way down to the statutory minimum.

The defendant's current sentence of 342 months[8] is reduced to a total of 204 months, consisting of 42 months on Count 5 and 162 months on Count 9, to run consecutively. The

---

[6] See Footnote No. 8, page 22.

[7] The court found earlier in this order that the defendant had not demonstrated extraordinary and compelling reasons with regard to his medical claim for compassionate release.

[8] The defendant's reduction is different from those for his co-defendants Turnipseed and Ford. Several factors account for these differences: (1) unlike the other two co-defendants, Ford did not benefit from an earlier Rule 35 motion; (2) co-defendant Turnipseed's Rule 35 reduction was greater than Woods' reduction; and (3) unlike Ford and Turnipseed, Woods participated in two, not three armed robberies. The court has taken all of these factors into account.

defendant's term of supervised release remains at 3 years.  All other provisions of the original judgment remain in full force.

To the extent that the sentence imposed herein on Count 9 could be considered a variance, the court determines that such action is appropriate considering the severity of the crimes at issue, and all of the other § 3553(a) factors mentioned above.

IT IS SO ORDERED.

July 25, 2023                                          Joseph F. Anderson, Jr.
Columbia, South Carolina                  United States District Judge